Good morning, Your Honors. Rex Sears, on behalf of Appellant SecurityMetrics, Inc., with me at council table with my partner, Sterling Brennan. May it please the Court. SecurityMetrics asks this Court to reverse the District Court's summary judgment on four of SecurityMetrics' counterclaims. One for false advertising under the Lanham Act, another for tortious interference under state common law, and the other two for violations of the Sherman Antitrust Act. Unless the Court would rather begin elsewhere, I'll start with tortious interference. So when First Data brought SecurityMetrics' tortious interference claim before the District Court on summary judgment, First Data did not dispute three things. One, that First Data had engaged in the conduct complained of. Two, that the number of First Data merchants serviced by SecurityMetrics had declined precipitously. And three, those two things happened at the same time. That is, First Data's misconduct and SecurityMetrics' losses were concurrent. Well, what the District Court essentially said was that SecurityMetrics failed to proffer admissible evidence of causation. Correct. Now, to show causation, SecurityMetrics presented two types of evidence. On the one hand, there were e-mails and call recordings reflecting communications with customers, where customers explained that the reason they were not doing business with SecurityMetrics was, for example, because of First Data's pricing structure or First Data representations, that it would not accept SecurityMetrics' reporting, etc. And so, on one hand, there were e-mails and call recordings. And then there was also . . . And Judge said those were hearsay. Correct. And one of the . . . They're not hearsay . . . You have actually two hurdles to surmount with respect to that. First, you have to show that the District Court was wrong in saying that they were hearsay. And assuming that the District Court was wrong, you have to explain that they do, in fact, demonstrate causation. Correct. So, taking those points in order, on the issue of hearsay . . . And we judge that by abuse of discretion? No, it's an issue of law, Your Honor. Excuse me? It's an issue of law reviewed de novo. And I believe we have a citation for that in our briefs. On the question of admissibility of evidence? Whether it's hearsay. What good does it do if it's hearsay if he says it's inadmissible? Didn't he rule he had inadmissible evidence? He ruled that it was inadmissible because hearsay. And our position is that it falls under the state-of-mind exception to the hearsay rule. Well, as to that exception, that is an exception. However, it seemed to me, from the record, you were trying to offer that evidence as to why, not just to prove their state of mind. Is that true? No. So, with regard to . . . First, let me say before you answer that, I think your standard is wrong. I think the standard is abuse of discretion. Now, an error in law is an abuse of discretion. But I don't think it's a de novo review, I don't think. But now, please answer Judge Floyd's. That may be correct. I'm sure it is correct. Okay. All right. But whether it is hearsay . . . You just said you thought he misapplied the law in determining hearsay. Yes. But you think . . . now answer Judge Floyd's question. Yes. And I'm sorry, Your Honor, would you mind . . . My question was, the state of mind is an exception. Yes. But you can't go further than the state of mind and try to offer why they did such a thing. And that's what the judge believed that you were trying to do. Right. So, what we had here is we had, as I mentioned earlier, first data did not dispute that it had engaged in the conduct, that it had made these representations. And then you had customers reporting that they were making decisions based on certain states of mind which were consistent with what first data had been advertising. So, that doesn't mean we're relying on the emails to say that these customers . . . basically, it's the question, why did the customers believe that? Why did the customers hold the beliefs that they held? And our view is that from the evidence that first data . . . from the undisputed fact that first data has representations in the market and that merchants had these beliefs consistent with first data's representations, a reasonable juror could bridge that gap and say, oh, this merchant believed this because first data had represented it. Well, but there was no . . . first of all, that has . . . you have to get even to that point, you have to assume that it's not hearsay in order to make the decision as to what . . . as Judge Floyd points out, it doesn't say . . . it doesn't . . . it doesn't specifically go to the question of why. It does go to the merchant's state of mind as to why the merchant is doing . . . the merchants are saying, we're going with first data because we believe it will be cheaper. We're going with first data because we believe we'll have to pay twice for the same service if we go with security metrics. So, you have customers saying that. And under the Hermann-Schwabe and other cases that we cited, that is admissible. It is interesting, by the way, the district courts take on that. So, the way this issue came up, first data in its opening brief said . . . on summary judgment said this is hearsay. In our response, we said, no, it falls under the state of mind exception. And then first data said, well, look at this case from the Southern District of Florida. And then the district on reply. And the district court latched on to that case from the Southern District of Florida. We didn't have a chance to brief it further. Our next chance to brief it was in connection with a Rule 59 motion. And at JA 1933, the district court's references to those cases is, I think, telling. What the district court said is, those cases are interesting. It doesn't . . . I'm not convinced that there is a clear error of law. So, take it to the Court of Appeals. So, in the district court's mind, it seems that the cases that we have cited to this court did raise a question. The district court was unprepared to take it up on Rule 59. Or it might just have been being nice. We encourage that. We encourage that, at least to this level. Yes. And Judge Bennett was always very courteous, but I never knew his kindness to interfere with what he thought was the correct thing to do. I just think maybe Judge Duncan is cautioning against over-reading an opinion. Over-reading an opinion. If you don't get this in, do you lose? No, because the other body of evidence that we have on causation is an expert report, a quantitative analysis performed by Clark Nesslin, that the district court did not even consider. We put this forward. And just to clarify, it's not disputed that the district court did not consider this expert analysis. We presented this expert analysis. We relied on it. Did you have a hearing in front of the judge? Yes. Did you talk about this report at all? We did. What did the judge say about it then? So, the judge... Anything? He did make... Yes. So, First Data argued that we had waived reliance on the report. Mr. Brennan got up and said, no, we didn't waive reliance on the report. And Mr. Nelson did not say he was not opining on causation. What did the court say? And then, the only thing I was able to read in the report came a little bit later when the court was talking about antitrust injury. And the court said, Mr. Nelson apparently doesn't get there. So, I read that as a comment about antitrust injury. That's the only comment I can find in the record of the summary judgment hearing. Didn't Mr. Nelson rely on the same emails and phone calls that the district court found were inadmissible? So, there's two sides to that. Yes, that was part of what he relied on. Experts can rely on hearsay. And he also just had a quantitative analysis that was independent of the emails. And what he did is this. Is this court in a position that we could look at that report and see that report does not indicate causation? Are we in the position to do that? May we review it and say it doesn't defeat summary judgment? I think that would be within this court's purview. Well, he got by a Daubert challenge, didn't he? The Nelson report survived a Daubert challenge. That is correct. In fact, the district court lauded it as a careful and sophisticated analysis in denying First Data's motion to strike the report. What do you want us to do about the report? Um, send it back to the district court and have him review it. Yes, that would be, uh, that would be an appropriate resolution, we believe. Um, to, uh, Judge Duncan's question, um, uh, in terms of, um, uh, does the Nelson report get us there without the emails and the call recordings? Um, I just want to step through briefly what the Nelson report did. What the Nelson report did on the quantitative side is first, uh, Nelson considered historical trends to show that the drop off was in fact, um, out of step with historical trends. Um, this would be what a variety of cases might might refer to as a benchmark analysis. Um, and then, uh, to the Nelson considered to the antitrust issue. Um, not so. So there's with the antitrust issue and antitrust injury. There was a question about how to, um, how to explain 210,000 merchants drop off. Uh, correct. Yes. Um, but so the drop off is relevant in two respects. One, it does relate to the antitrust injury inquiry. Um, it also relates to, um, uh, the tortious interference damages, uh, tortious interference claim, which is what we're talking about right now. Specifically, does it go to causation? Because you're running low on time. Yes. So it goes to causation. Um, as as follows. Um, Nelson considered a variety of explanations for potential explanations for the drop off. Um, won't go through all those here. The two leading explanations were security metrics explanation, namely first date is misconduct. First date is because we used to we used to contract with security metrics and send work to security metrics. Now we've gone into competition with security metrics. And so what Nelson did is he found the there was one other analogous circumstance, and we've referenced this in our brief as a as a kicker analysis that Nelson performed. You can find it in more detail at J. A. 1833 and J. A. 1867. Um, and what we didn't do in our briefs, I noticed preparing for argument is identified as a question. Yes, just answer the question. So so, um, you just analyze it and said, in my expert opinion, looking at the drop off, it has to be caused by conduct from the outside. And the reason he said that is because security metrics had another relationship with another acquirer, um, that also terminated that other acquired or acquirer went into a security metrics did not engage in the kind of misconduct that first data engaged in. And first date is sorry. Security metrics attrition among those other merchants. The Barclay card merchants was much lower than among the first day of merchants. And so, Mr Nelson looked at that and said, Okay, so, uh, the competitive relationship analysis is not enough to explain the drop off because we had that in another case, and there wasn't the same drop off. Could I just please clarify the misconduct that you are referring to? Is that the Lanham Act violation? Is it the false advertising? It encompasses that I'm trying to. I'm trying to find where we start because right now I'm having trouble with. It's almost like a circle, and I keep going back to look for the starting point of the analysis. So don't you have to assume the existence of the misconduct to support the cut? It seems to me that you're have to assume the existence of the very misconduct that you are alleging to support the causation argument is you're explaining it. Am I not correct? Um, am I okay to answer? Um, so, uh, it's it's not. It's assumed by operational flaw because we were there on summary judgment and first data never said we didn't engage in the conduct. That was not the basis for first. It is motion. First data said. Assume that we engaged in the conduct. No, no, no, no, no, no, no. Summary judgment doesn't assume you a violation of the law. Summary judgment is on facts. So, uh, first data. It's not. It's not a violation of the law that you don't get that on summary judgment. First data did not dispute that it had engaged in the conduct on which the tortious interference claim was predicated. That's not the same thing as saying that they agreed that they broke the law in order to get to. You broke the law. We have to show causation. That's that's where we go back into that. And so we have to show conduct injury causation. First data didn't challenge conduct, but it does challenge constitutes, does not concede that it constitutes false advertising. So it doesn't dispute the conduct. It disputes the misconduct label on which you appear to rely. Um, so on the false advertising, um, there were other predicates. Um, there were, for example, market based, um, not an advertised, uh, misrepresentations that were made that were not part of the Lanham Act claim. And so the point is just that the Lanham Act claim does not exhaust the conduct on which tortuous interference is premised. Let me ask one question. I want to ask one question for just a short 10 second answer. I'm gonna ask the other side. Why such acrimony and death throat battle between the two of you guys, two clients? Why is that? Just goes out of a bad relationship that went sour. Is that it? Um, from security metrics point of view, I think it was an existential challenge. And was a disastrous thought you would go out of existence if you lost their business. Um, it was enough. But that happens. But it happens all the time. It happens all the time in business. But y'all seem to be the district court sites at the origins of this contentious case line. The soured business relationship. Is that just they just got to the point that they gonna fight it out? I think the district judge also fingered it in in other hearings where the parties on the one hand, they were litigating this case. On the other hand, they still had to work together with his body of 80,000 first aid emergency. But you you would think that that might make the relationship better than worse. But I thank you for your answer. You have some time. I'm asked the other side the same thing. Thank you. You did save some time. Thank you. Stardale when when you're ready. Mhm. Mhm. Good morning, Your Honor. May it please the court. My name is Michael Idel with me. Council table is my partner, Joshua Horn, and we represent happily and cross appellant. And there is a cross appeal in this case of the first data, which I'll refer to the two first data parties for convenience as first data. And we have reserved three minutes for you may have to speak up just a little bit of pull that microphone a little bit closer to you to be sure we hear everything. Thank you. Thank you. Standard of review on the on the attorney's fees issue. It's de novo review of a state statute, Your Honor. Um, and if I may jump to the attorney's fees argument because there are a number of issues. But if I could follow up on that, the point here, Your Honor, is that under the Utah statute, that was a counterclaim by security metrics upon which first data unquestionably prevailed. Under that statute, under subsection a of it, it says that a party may bring in action for violation of that statute under subsection C, which is one of the remedies, is that the court shall award in a mandatory language, the court shall award attorney's fees to the prevailing party. And the question is, what is the interpretation of that term prevailing party? And is it the same as a contractual analysis? Or is there a statutory analysis under Utah analogous Utah law? Because that specific section of the Utah statute has not been interpreted by the state's intermediate court. And so, uh, it's your argument. I'm sorry, but I'm just to get it to my point as quickly as possible and take up as little of your time as possible. Thank you. Your argument is that the fact that the state statute makes the award of attorney's fees mandatory takes away any discretion on the part of the district court in awarding attorney's fees. And that's what makes it de novo instead of an abusive discretion. Is that correct? That's correct, Your Honor. It's it. There was there was no discretion to determine that that first data was the prevailing party. There is discretion as the amount of fees there always is. Uh, no, wait, wait, wait, wait, wait, wait, wait, wait. No, no, no. That's two different questions. Now shall award is one question to prevailing party. That's two different questions. Now seems the prevailing party has to be is that's a necessary determination that predates the shall award. Pardon me, Your Honor. You're correct. And that is that there is discretion. Once once the statute is interpreted, the question is, who is the prevailing party and the court? That's that's within the discretion of the court to decide who prevailed. But the further question, though, is before you get to that question is, uh, how do you decide what prevailing means? Does prevailing mean solely with respect to the claims under the statute? Question of prevailing party. That's that question, right? And and I would submit, Your Honor, that that's a question of law that under the statute, the intent of the Utah legislature was based upon our arguments in the brief, the language of the statute, analogous statutes that the prevailed on a claim under that statute. So you don't want to look at the entire litigation, just only look at that one cause of action, say you prevailed, and so therefore you're entitled to attorney's leave. That's correct. Well, that view has been rejected in Utah, at least about one judge that says that, uh, because a plaintiff did not show up, it was successful on seven other causes of action. It was successful on one, but not on the others. Right. And that was under a contractual analysis, Your Honor. But under under a statutory analysis, under the Guy case, which interpreted the mechanics lien statute, under the there's another case, I believe it's Harris, but pardon me if I got the name wrong, that discusses the anti-deficiency statute. Under those sorts of statutes, what the what the courts, the Utah courts do say is that whoever prevails on that statutory claim, regardless of how they did on in the rest of the case, that attorney's fee shall be awarded. But has it, as I understand it, Utah has looked at prevailing party in the context of other statutes and has concluded, as do federal courts generally, that it depends on a number of factors which implicate the district court's discretion. So it's not as clear to me, and I'm asking you to help me with this, as it seems to be to you, that the district court's discretion was completely cabined by the statutory language and that the district court could not determine in the exercise of its discretion, whether or not looking at the case as a whole, first data was a prevailing party. Under the case law in Utah, as we've laid it out in the brief, there are two parties, a prevailing party on a statutory claim, and there is a set of factors that determine whether, under a contractual prevailing party fee analysis, that the party has prevailed. In the statutory paradigm, the first element of it is to look to see who prevailed on the statutory claim. Then there are other factors. Was the statutory claim and was that sufficient? Were there other countervailing factors? Was there a Rule 68 offer? Things like that. So if we were to send it back, which you seem to think is the correct result, it would be within the district court's discretion to consider those factors and determine, in the exercise of its discretion, to award you $10. Would you be happy? Not be happy, Your Honor. But yes, it's within the judge's discretion to decide how much we should be awarded. I think under the first element of the statutory analysis, that paradigm, the court really, it would be clear error and an abuse of discretion if the court were to decide we were anything other than the prevailing party on the statutory claim. And we would say that it would be an abuse of discretion for the court then to go further and say, and further, I want to look at how you did in all the other claims. We think the analysis should stop right there, and then decide with respect to the other factors to say basically how prevailing were we. Because the statute doesn't say, on statutory interpretation, doesn't say that we, that the party must prevail in the entire action. It simply says that under that statute, on that claim, the prevailing party shall be entitled to fees. What are we to do with this report? I apologize. What are we to do with the report, the expert's report? Your Honor. The district court didn't deal with it, did it? It did, Your Honor. I couldn't find where it did. In its order, did it deal with it at all? In its order? In its order, it didn't because it wasn't raised, Your Honor. What do you mean it wasn't raised? It wasn't raised on summary judgment. It wasn't raised on summary. Was it in the record? It was in the record. Was it discussed? It was referred to. It wasn't discussed on summary judgment as evidence of causation. Wait, wait, wait, wait, wait. Was it clear that this report was in the record, had been presented, and the district court was aware of it before he issued summary judgment? Yes, Your Honor. Then how did he deal with it? He dealt with it as follows, Your Honor. Okay. First of all, there was a Daubert hearing, as Your Honor, as the panel pointed out. It survived the Daubert hearing, but if you read the court's Daubert ruling, what the court said was that to the extent that the Nelson report was going to be used for causation, we're going to defer that to another day because we had challenged that report. And then you deferred it, and what did the court decide when it finally decided the causation issue? And the court decided, because this was the argument the security metrics made, and if you look at their opposition on summary judgment, they argued that Nelson made a quantitative analysis merely as to the amount of damage, not to the fact of damage. They distinguished that the calls and e-mails were offered, and this is their verbiage, were offered for the qualitative argument that about causation, and that Nelson was offered on the qualitative side as to the amount. The district court took security metrics at its word. And said so somewhere? And said so. Where did they say in the order? What did they say anywhere in the order did they say that? In the summary judgment ruling, the judge said in his ruling that he was looking at the calls and e-mails as the evidence of causation that was urged by security metrics. They didn't urge on summary judgment that Mr. Nelson was evidence of causation, and the judge was well within his discretion to conclude that because Mr. Nelson had testified he wasn't testifying as to causation. He did not expect to offer an opinion on that. Now, I know that there's some dispute with security metrics about them saying that, well, he also had other testimony where he said he might be talking about correlation or links. But when I asked him, are you going to offer an opinion at trial about causation, he said no. And the district court was well within its discretion to credit that testimony and choose that testimony and say, I am not considering Mr. Nelson's report as evidence of causation. But it didn't consider it in the antitrust context either, did it? He did not, Your Honor. Because, first of all, Mr. Nelson didn't purport to be an antitrust expert. Okay. But we don't have any basis for understanding what his reasoning was for not considering it in either context, causation or in the tortious interference context or the antitrust context. I think that that's right, Your Honor. I don't think we understand why. Well, it actually seemed to make more sense, just analytically, in looking at the nature of the report. It seemed to go more to the antitrust. Yeah, as to security metrics damages, but not as to injury to competition, about which there was no evidence whatsoever, no expert, no evidence. To answer Your Honor's questions earlier to my opposing counsel. Which questions? Yes, one of them. The determination of whether something is hearsay is a matter of law, is a clear error of law. But you're right, Your Honor. The evidentiary questions are always abuse of discretion. It's abuse of discretion on determination of admissibility of evidence. But an error of law in making that determination is an abuse of discretion. Right. And, Your Honor, the statements that were offered, the calls and emails that were offered, is substantive evidence of causation and loss. Ergo, they were used for the truth of the matters asserted. They were hearsay. The argument was that there's an exception that allows that hearsay to be used for their purposes under 803. 8033. That was their argument, that it's state of mind. And, therefore, it's evidence as to the truth of the state of mind of the out-of-court declarants. The problem that the Court found, and that found that the air turbine case was persuasive authority, was that you can't go further to the second part of 803B, 8033, because I'm not going to allow out-of-court declarants statements to come in as to the reasons why somebody has a statement of a memory or belief, to prove the fact asserted. So the Court found that there was no link-up. There was no causation. The Court's recent September opinion in the Lew case, U.S. v. Lew on 8033, is precisely on point. Criminal case, but on 8033. It is. Is this hearsay in these statements, is it reducible to admissible evidence? There is a portion of the statements that would be admissible as an exception under the hearsay rule, and that is as the statements of motive, intent or plan of those out-of-court declarants. So if you have the calls or e-mails that are representative of the motive, intent or plan of the merchant or the independent sales organization who's on the phone with the security metrics people to say, my intent is to terminate your services or my plan is... By the way, it doesn't matter to anybody's argument. I read those calls. I thought they made a better case for harassing phone calls, quite frankly. I think finally one person goes, listen to me. I don't care. I've already told you. I'm not paying you. I'm not dealing with you. Don't bother me. It sounded more like harassing phone calls than they did anything else to me. But I just wonder, you know, hearsay that's reducible to admissible evidence may be used to defeat summary judgment, correct? It can if it's admissible evidence. And that was one of the... Reducible to admissible evidence. Reducible to admissible evidence. That's what Justice Rehnquist said, Chief Justice said. Right, Your Honor. And under 8033, the motive of those customers or independent sales organizations reflected in the calls and emails would be I want lower prices or I don't want to be bothered by security metrics anymore or I'm going with first data because I think it's a better product. However, they can't go further, and this is the Lew case and all of the other 8033 cases. You can't go further when? You can't go further and say. No, no. To read from those statements or to bring those people in to testify? Oh, if those people were brought in to testify, it would be a different story, Your Honor. And that was one of the problems with security metrics cases. They didn't depose anybody. At trial. Oh, at trial. Ask him. I don't want to take too much of your time, but why couldn't you get their statements? Why might they not be usable at summary judgment because they might be reducible to admissible evidence at trial? They might have been. They might have been. But they didn't exist. What about your Lanham Act case? Isn't whether an advertisement is literally false a question of fact for a jury? No, Your Honor. In fact, you know, this court in Design Resources specifically affirmed summary judgment on a statement that was literally true or false. I think that Judge Legg had it correct in the Millennium case where he said, and it's in footnote 10 of that case, and it said in the Design Resources case as well, you need to look at all the court needs to look at a statement in the first instance. The court needs to look at the statement to see based upon the unambiguous statement or language of the claim or the advertisement as to whether it's literally true or literally false. And in this particular case, the court allowed the case to go forward, and after a motion to dismiss stage, the case really proceeded upon a misleading theory as opposed to one that was false. Your argument is some questions can clearly be, as a matter of law, literally true. It might just be then implicitly they might not be correct. But if you say, I'm going to give everybody candy, and you give everybody candy, that's literally true. If you take it back right after that, then there might be some, you might have another problem. But clearly something that, something can be literally true as a matter of law. That's correct, Your Honor, and I agree. But that doesn't necessarily get you home in the grand scheme of the cause of action. Right. But you can have statements that would be, some might not be literally true when you look at them, but many could be just as a matter of law for that first step. That's right, Your Honor. And it always has to be because, and in the language of summary judgment, there was no disputed issue of fact presented to the district court that would have prompted him to say that these are anything other than literally true. Your Honor, there is one thing I wanted to address on the hearsay point, which was raised by my, by Security Metrics Counsel, which was that an expert can rely upon hearsay. That's not entirely an accurate statement of the law. Under 703, an expert can, Federal Rule of Evidence 703, an expert can rely upon hearsay or inadmissible evidence if it's of the kind that an expert reasonably relies upon in his or her field. The second part of 703 says, though, that inadmissible evidence is not made, you know, otherwise inadmissible evidence is not made admissible simply because the expert relies upon it. And Mr. Nelson relied solely on the calls and emails. That didn't make his opinion admissible. Let me ask this question. Why the death match between these clients? I'm just asking. Your Honor. It's bitter and hard fault and continues to be fault. And I'm just wondering why that's so. I think that it was, from the business perspective, it was a business divorce. And I think that there were hard feelings among people there. I think you said divorce. I think I did it. Yeah. Among counsel, I have to say, counsel, we left no stone unturned. But I don't think counsel ever raised an ill word about the other during the entire course of the litigation. Those stones that you didn't leave unturned, did you throw them at each other? I thought that was what you were going to say. No, we left them for the district court to decide. Thank you, Your Honor. Anything else? Anything else? I think you're going to come back up in a bit by my instructions, but I have Mr. Sears up next and then Mr. Idell, you up to end the argument. Mr. Sears? Thank you, Your Honors. So, addressing a few things, I'll come back to attorney fees in a minute. First, the notion that security metrics did not depose anyone, that's not accurate. We deposed, for example, an ISO and got some pretty good testimony out of him about, sorry, an independent sales organization representative and got some pretty good of the tying arrangement. I'm sorry, I thought that the question about the deposition was with respect to the sources of the e-mails and the phone calls. And if so, then that's correct. We did not depose those people. As Judge Shedd pointed out, we were not dealing with happy customers. That wouldn't have helped the situation in any event. On hearsay, it sounds like we've now all come, in terms of the standard of review, it sounds like we've all come around to the point that admissible, sorry, admissibility generally is reviewed for abuse of discretion. Hearsay, in particular, is a question of law. I had thought we cited case law on that in our briefs. You can move on from there. I think we all have it on the same sheet. With regard to the sufficiency of Mr. Nelson's report to demonstrate causation, one thing I'd like to direct the courts, or I would ask the court to consider. Just let me say this. You heard what he said about the report, that you indicated you were not offering that for causation. You were only offering that for damages. And I think if the court reviews. Tell me why that's not correct. Because as reflected on pages 18 through 21 of our reply brief, Mr. Nelson in deposition said he was going to talk about causation. Mr. Brennan said at the hearing, Nelson is going to talk about causation. I thought that the point being made is that he wasn't offering an opinion on causation, which may be a little different from his talking about it. Is that not? So let me see if I can find. Let's see. I don't want to take up a lot of your time. I wonder if that response is entirely helpful or if there's more. So this is quoted on page 18 of our reply. This is from Mr. Nelson's deposition. I provide an analysis of the causal connection between the alleged bad acts and the harm that's alleged to have occurred to security metrics. I don't know how you get more clear than that. I understand. You're not coming back. Help me, please, with the standard of review, your interpretation of the standard of review with respect to the attorney fees issue. With respect to attorney fees, I think that's another area where we are agreed that it's abuse of discretion as to prevailing party and amount. In terms of the question of statutory construction, that's de novo review. And then I will be getting back to attorney fees in just a minute. I wanted to make one other observation regarding the Nelson report. This court's opinion in the metrics warehouse . . . I'd do it quickly because the judge has a question on the table for you. I'm sorry. Did I not answer that question? No. I think we're okay. Okay. You said you're going to get back to attorney fees. Yeah. I was a little confused about that, too. Is it divisible? Is your response divisible in the different responses on different aspects of attorney fees? Can I throw out one citation on Mr. Nelson, set that aside, and then we'll spend the rest of the time on attorney fees? I'm sorry. I do not mean to direct your argument. No. I appreciate the direction. Say what you want to say about the report and then quickly move back to attorney fees. Yes. So on the report, if this court will look at its opinion in metrics warehouse, it must be Daimler-Benz 828F2nd 1033 at 1044. You don't need to look at all that. It's a factual issue, and you pointed out he indicated he was going to talk about causal connection. Yes. We know what the law does and doesn't allow. Okay. All right. That footnote . . . By the way, let me stop and tell you something. We're not trying to direct your argument, but we're indicating to you what we really care about and want an answer for, so it's generally helpful to respond to the issues that we've sort of brought to the point. So on the attorney fees, the statutory construction argument that First Data makes rests on footnote 5 in the Guy opinion, and First Data generally quotes the first sentence. We emphasize that a court should look only to the party's claims and counterclaims relating directly to the specific mechanics lien at issue. The court then goes on, stated another way, when assessing which party is the successful party, a court should confine itself to considering those claims relating directly to the particular party and the particular work. Now, I emphasize this just as a way of pointing out that it's not just who won on that particular claim. It's who won on the subject matter of that claim. As Judge Bennett pointed out in his order, that claim overlaps with other claims. For example, it overlaps, as we pointed out in our briefing, with the merchant data claim that went to trial that Security Metrics won on. That is part and parcel of the Utah Truth in Advertising claim. It overlaps as well with several of the other claims. So the point is, Judge Bennett. You can't parse it quite as finely. Right. It's not just that claim. It's the subject matter of that claim. Judge Bennett properly looked at that and decided, even if I narrow my focus, it's still not the case that First Data is the prevailing party. Excuse me. In terms of divisibility, was there still a question unanswered with regard to the standard of review? No, I'm fine with standard of review. All right. So the one other point I would make on attorney fees is First Data argues that there are distinct lines of authority within Utah law for construing contractual versus statutory attorney fees provision. This is undermined by its primary case. The Guy case expressly cited and drew from a contractual attorney fees case the flexible and reasoned approach that Judge Bennett applied here. If this litigation continues on beyond this, is there any way we can encourage you to let the people in Utah have a shot at answering all these questions? In other words, by bringing any and all actions in Utah, maybe? We tried, Your Honor. First Data sued in Utah, lost the first case. I'm just asking. Anything else for him? Anything else? Thank you very much. Thank you, Your Honor. Thanks for hosting us. Thank you. Mr. Idell, you're going to wrap it up for us. Thank you, Your Honor. Very quickly, with respect to the Guy decision on attorney's fees, I couldn't agree with counsel more as to the statement in the Guy case that you look at the statute. Did we get you all to agree? Yes, we did, Your Honor. And so if we look at the claims under the statute, and counsel expanded it further to look at a subject matter test, subject matter related to that statutory claim. If Your Honors look at the record, and this is argued in the briefs, the subject matter related to the Utah statutory claim are the Lanham Act claims, which we also prevailed upon, and which our defense in the case necessarily included defense of the Lanham Act claims and the Utah claims, which were overlapping. This is the first time that I believe it's been argued, or we've even heard that a merchant data claim, a wholly separate contract claim was somehow related to the Utah statute. With respect to the Nelson report, the Nelson report need not be sent back because, again, Judge Bennett was within his discretion to accept the testimony of Mr. Nelson, where he said he was not going to offer an opinion at trial on causation. I thought your rebuttal was limited to the cross-appeal. I apologize, Your Honor. Yes. And so with respect to the attorney's fees, one other question. I'm sorry. One other point I wanted to make. In Judge Bennett's opinion, there is an error about what First Data was seeking in terms of its fees. Judge Bennett was under the misimpression that we were seeking fees for the entire case, whereas what we submitted were fees that were directly attributable to the defense of the Utah claim and the overlapping Lanham Act claims. And Judge Bennett has a mistake in his September 22, 2015 decision, where he was under the impression that we were seeking it for the entire case. I'm not sure if that led to any other misimpressions in the way that he analyzed the claim, but I wanted to clear that up for the Court. Your preference would be to send the case back on causation as to the Nelson report and attorney's fees, or to affirm? No, Your Honor, and I was going to conclude by saying that First Data urges that the Court affirm the summary judgment ruling in its entirety. I didn't ask you that. I said, if you had the druthers, I'm just asking you to understand the argument. To go back on the report to get some edification on why that wouldn't defeat the summary judgment and to revisit attorney's fees, or to leave it all alone? Affirm? The druthers would be to leave it all alone, Your Honor. Okay. Okay. Anything else? No. Thank you very much. Thank you, Your Honor. Thank you all very much.
judges: Dennis W. Shedd, Allyson K. Duncan, Henry F. Floyd